UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
DANIEL PRESTI, *et al.*,

                          Plaintiffs,

           - against -

CITY OF NEW YORK, *et al.*,

                     Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-3811 (PKC) (SJB)

PAMELA K. CHEN, United States District Judge:

      Plaintiffs Daniel Presti ("Presti") and Louis Gelormino ("Gelormino") (collectively, "Plaintiffs") bring this action against the City of New York ("City") and six officers of the New York City Sheriff's Office ("Sheriff's Office")—specifically, Sheriff Joseph Fucito ("Sheriff Fucito"), Sergeant Kenneth Matos ("Sergeant Matos"), Sergeant Richard LeBlond ("Sergeant LeBlond"), Sergeant Furney Canteen ("Sergeant Canteen"), Deputy Sheriff Marjorie Anselme s/h/a Matt Anselme ("Deputy Anselme"), and Deputy Sheriff Rueshiem Jones ("Deputy Jones") (collectively, "Defendants")—under 42 U.S.C. §§ 1983 and 1988.  Presently before the Court is Defendants' motion for summary judgment.  For the reasons that follow, Defendants' motion for summary judgment is granted as to all of Plaintiffs' remaining claims and this case is dismissed with prejudice.

## BACKGROUND

**I.    Factual Background**[1]

      At the height of the COVID-19 pandemic, New York City and New York State issued various public health restrictions aimed at preventing the virus's spread.  The City authorized the

---

[1] Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however,

Sheriff's Office to enforce those restrictions.  (Pls.' R. 56.1 Statement, Dkt. 46-1 ("Pls.' 56.1"), ¶ 1.)  The restrictions included curfews for bars, prohibitions on indoor dining, and masking requirements, among other things.  (*See generally* Dkt. 45-8.)

In November 2020, Mac's Public House ("Mac's"), a pub in Staten Island, gained notoriety for publicly flouting various of the aforementioned COVID-19 restrictions.  (*See generally* Am. Compl., Dkt. 20 ("Am. Compl."); Dkt 45-8.)  Plaintiff Presti, Mac's general manager, posted signs on the windows that read:

> !ATTENTION!
> As of November 20, 2020 we hereby declare this establishment an
> AUTONOMOUS
> !!!ZONE!!!
> We refuse to abide by any rules and regulations put forth by the
> Mayor of NYC and Governor of NY State.
> The Management

(*See* Pls.' 56.1 ¶¶ 6–7; LeBlond Aff., Dkt. 45-10 ("LeBlond Aff."), ¶ 4 & Exs. A, B; Tr. of Daniel Presti Dep., Dkt. 45-9 ("Presti Dep. Tr."), 63:10–17.)  The words "AUTONOMOUS ZONE" were also written in large capital letters in bright orange tape on the sidewalk outside.  (Pls.' 56.1 ¶ 9; *see also* LeBlond Aff. Ex. C.)

On November 24, 2020, at approximately 10:50 p.m., deputies from the Sheriff's Office, including Sergeant LeBlond, visited Mac's to investigate suspected violations of the COVID-19 restrictions.  (*See* Pls.' 56.1 ¶¶ 4–5; LeBlond Aff. ¶¶ 3–5.)  During that visit, the Sheriff's Office served Mac's with a New York City Department of Health & Mental Hygiene Commissioner's

---

the Court may cite directly to an underlying document.  The Court construes any disputed facts in the light most favorable to Plaintiffs for purposes of Defendants' summary judgment motion.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, where either party (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in in the other's 56.1 statement, the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)–(d).

Order for Closure of Premises for Violation of Health Code Section 3.07.[2]  (Pls.' 56.1 ¶ 4; LeBlond Aff. ¶ 5; *see also* Dkt. 45-8 (closure order).)  Subsequently, on November 27, 2020, Mac's liquor license was suspended in connection with the violations.  (Pls.' 56.1 ¶ 11; *see also* LeBlond Aff. ¶¶ 6–7.)

Despite the closure order and the suspension of its liquor license, Mac's opened to the public on December 1, 2020.  (Pls.' 56.1 ¶¶ 13–14; Presti Dep. Tr. 86:16–88:1.)  Plaintiff Presti arrived there at approximately 5:00 p.m., along with his bartender, Yareth Urkonis, and cook, Matt Soto.  (Pls.' 56.1 ¶ 13; Presti Dep. Tr. 87:1–6.)  Mac's was serving food and alcohol to patrons, and some patrons were making cash donations.  (Pls.' 56.1 ¶ 14; Presti Dep. Tr. 87:18–88:6; Schwicke Aff., Dkt. 45-14, ¶¶ 4–9.)  Plaintiff Gelormino, an attorney, arrived at Mac's at around 5:45 p.m. that day.  (Pls.' 56.1 ¶ 15; Tr. of Louis Gelormino Dep., Dkt. 45-15 ("Gelormino Dep. Tr."), 68:17–21.)  Gelormino informed Presti and the other employees that he had been communicating with the Sheriff's Office, but that those communications had "broke[n] down" earlier in the day and that he expected the Sherriff to "come in and try to shut [Mac's] down" that night. (Gelormino Dep. Tr. 68:24–69:21.)

Shortly thereafter, Sergeant LeBlond, Sergeant Canteen, and other deputies from the Sheriff's Office arrived at Mac's.  (Pl.'s 56.1 ¶ 18; Gelormino Dep. Tr. 87:2–11 (testifying that he was only at Mac's for ten minutes before the sheriffs came); LeBlond Aff. ¶¶ 8–11; Decl. of Sergeant Furney Canteen II, Dkt. 45-4 ("Canteen Decl."), ¶¶ 4–9.)  Upon their arrival, the deputies instructed Mac's patrons to leave, but asked employees to stay and provide identification.  (Pls.' 56.1 ¶ 19; Gelormino Dep. Tr. 88:17–19, 93:24–94:4.)  Gelormino introduced himself to the

---

[2] The closure order lists the COVID-19 restrictions that Mac's violated.  (*See generally* Dkt. 45-8.)

deputies as Presti's attorney and asked to remain, which the deputies permitted. (Defs.' Reply R. 56.1 Statement, Dkt. 47-1 ("Defs.' Reply 56.1"), ¶¶ 19–20; Tr. of Sergeant Richard LeBlond Dep., Dkt. 45-16 ("LeBlond Dep. Tr."), 142:20–25 ("Initially, when we went in, we allowed patrons to leave. At that time we didn't know who Mr. Gelormino was. He identified himself as Counsel, asked to remain, he was allowed to remain.")); Gelormino Dep. Tr. 88:19–89:11.) Gelormino then took out his camera to start filming the incident, but stopped recording when a sergeant "got up in [his] face . . . and demanded [his] ID," which Gelormino "took . . . to mean the [sergeant] wasn't very happy with [him] recording[.]" (Pls.' 56.1 ¶ 23; Gelormino Dep. Tr. 98:4–10.) It was around that time that Gelormino first "got the impression" that he was not permitted to leave. (Pls.' 56.1 ¶ 25; Gelormino Dep. Tr. 100:10–101:2.)[3] Gelormino gave his ID to the deputy. (Gelormino Dep. Tr. 101:6–10.)

Ultimately, Plaintiffs Presti and Gelormino were both issued criminal court summonses for misdemeanors.[4] (Pls.' 56.1 ¶¶ 29–30, 37; Canteen Decl. ¶ 10 (explaining that Gelormino was issued "summonses for various violations, including: (1) Executive Law § 24(5), Violation of Governor's Emergency Order; (2) Administrative Law § 3-108, Violation of Mayor's Emergency Order; and (3) New York City Charter [] § 562, Failure to Observe Order of the Commissioner of Health").) The deputies then instructed everyone to leave the premises. (Pls.' 56.1 ¶¶ 32–34.) When Presti refused, the deputies handcuffed him and escorted him to the Richmond County

---

[3] As referenced below, *infra* note 15, the parties dispute whether Gelormino asked to leave the bar after his attempted filming was curtailed. However, as discussed, the Court finds that any such factual dispute is immaterial because Defendants are entitled to qualified immunity with respect to Gelormino's false arrest claim. *See infra* Discussion § II.

[4] It is unclear exactly how long the encounter on December 1, 2020 lasted. (*See* Presti Dep. Tr. 108:24–109:1 (Presti testifying that he was held inside Mac's pub for approximately an hour); Gelormino Dep. Tr. 92:2–7 (Gelormino testifying that he believes the deputies kept him and Presti "in there for almost an hour-and-half while they wrote summonses")).)

Sheriff's Office.  (*Id.* ¶¶ 35–36.)  The summonses issued to both Gelormino and Presti were dismissed and then subsequently reinstated.  (*Id.* ¶ 37.)

The next evening, on December 2, 2020, Presti and Gelormino attended a rally outside Mac's.  (*Id.* ¶¶ 38–40.)  "[A]bout 25 sheriff deputies . . . [had] formed a blockade" in front of Mac's and were not letting members of the public in.  (*Id.* ¶ 41; Presti Dep. Tr. 119:5–15.)  Both Presti and Gelormino spoke to the crowd and expressed how "proud" they were that Mac's was defying the COVID-19 restrictions.  (Pls.' 56.1 ¶¶ 39–40, 42–44.)

On December 4, 2020, Presti reopened Mac's to the public and resumed serving food and alcohol, despite the closure order and the suspension of Mac's liquor license.  (*Id.* ¶ 45.)  Presti opened Mac's again the following day, on December 5, 2020, until around 10:00 p.m.  (*Id.* ¶¶ 49–50.)  Presti and a few other individuals left Mac's shortly after midnight on December 6, 2020.  (*Id.* ¶ 51.)  After locking the front door, Presti started walking to his car, which was parked nearby on South Railroad Avenue outside the railroad station.[5]  (*Id.* ¶¶ 52–54.)  Sergeant Matos and Deputy Anselme, both of whom were in uniform at the time, started to approach Presti as he walked to his car.  (Pls.' 56.1 ¶ 55; *see also* Decl. of Sgt. Kenneth Matos, Dkt. 45-3 ("Matos Decl."), ¶ 4; Tr. of Deputy Marjorie Anselme Dep., Dkt. 46-4 ("Anselme Dep. Tr."), 39:4–40:19.)  Presti ran to his car, got in, and locked the door. (Pls.' 56.1 ¶¶ 56–58.)  Sergeant Matos and Deputy Anselme ran after Presti.  (*See* Security Video 1, Ex. 18 to Balestriere Decl.)  Sergeant Matos positioned himself squarely in front of Presti's car and Deputy Anselme stood on the passenger side.  (*See id.*)  Presti then drove his car directly into Sergeant Matos and continued driving with

---

[5] The parties dispute how well-lit the area around Presti's car was at the time of the incident. (*See* Defs.' Reply 56.1 ¶ 54.)  The Court notes, however, that the area appears to be quite well-lit based on the video evidence submitted by the parties.  (*See* Security Video 1, Ex. 18 to Decl. of John G. Balestriere in Supp. of Pls.' Opp'n, Dkts. 46-2 & 46-3 ("Security Video 1, Ex. 18 to Balestriere Decl."), submitted to the Court via Dropbox.)

Sergeant Matos clinging to the hood of Presti's car.  (Pls.' 56.1 ¶¶ 55–69; Defs.' Reply 56.1 ¶¶ 61, 66; Matos Decl. ¶ 3; Security Video 1, Ex. 18 to Balestriere Decl.; Security Video 2, Ex. 25 to Balestriere Decl., Dkts. 46-2 & 46-3 ("Security Video 2, Ex. 25 to Balestriere Decl."), submitted to the Court via Dropbox; Security Video 3, Ex. 26 to Balestriere Decl., Dkts. 46-2 & 46-3 ("Security Video 3, Ex. 26 to Balestriere Decl."), submitted to the Court via Dropbox.)  Presti later testified that he could see Sergeant Matos's face while he was driving, but did not know that Matos was law enforcement and did not notice his uniform.[6]  (*See* Pls.' 56.1 ¶ 63; Presti Dep. Tr. 161:8–24, 172:6–22.)

Presti continued driving with Sergeant Matos on the hood.  (Matos Decl. ¶ 3.)  A tan sedan—an unmarked Sheriff's deputy vehicle driven by Sergeant LeBlond—forced Presti to turn left onto Lincoln Avenue.  (Pls.' 56.1 ¶ 65; Presti Dep. Tr. 173:2–24.)  The sedan then forced Presti to turn left onto North Railroad Avenue by swerving towards Presti's car.  (Pls.' 56.1 ¶¶ 67, 68.)  After Presti turned, the tan sedan eventually stopped Presti's car by "striking" the right passenger side.  (*Id.* ¶ 68; Matos Decl. ¶ 3; Security Video 3, Ex. 26 to Balestriere Decl.)

---

[6] The parties dispute whether Presti knew or should have known that Sergeant Matos and Deputy Anselme were law enforcement.  (*See, e.g.*, Pls.' Mem. in Opp'n to Defs.' Mot., Dkt. 46 ("Pls.' Mem."), at 12.)  Sergeant Matos and Deputy Anselme both testified that they identified themselves as police several times while running after Presti, but Presti claims that he only heard them yell his name.  (*See* Matos Decl. ¶¶ 2–3 ("Mr. Presti started running to his car as my partner and I approached him, with both of us yelling 'Police, don't move.  Police, don't move.  Presti, please don't move!' . . . . He ignored our repeated commands to stop, quickly entered his car, and put it in gear, while I was standing in front of the vehicle, yelling again very loudly: 'Presti, stop.  Police, don't move.  Presti, get out of the vehicle.  Turn off the vehicle.'"); Anselme Dep. Tr. 29:8–11, 31:5–25 (Anselme testifying that she and Sergeant Matos identified themselves as police when they initially approached Presti); Presti Dep. Tr. 152:16–154:10 (Presti testifying that he heard somebody yell out "hey, Presti," and then saw two individuals running towards him), 155:24–156:20 (same).)  Likewise, while it is undisputed that Sergeant Matos and Deputy Anselme were in uniform at the time of the incident, (*see* Matos Decl. ¶ 4; Anselme Dep. Tr. 39:4–40:19), Presti testified that he could not tell if the individuals were in uniform, (Presti Dep Tr. 161:11–22).

Sergeant Matos rolled off the hood of Presti's car and forcibly removed Presti from the car before taking Presti to the ground and handcuffing him. (Pls.' 56.1 ¶¶ 69, 71, 75–79; *see* Matos Decl. ¶ 7 ("I swiftly pulled [Presti] from the car and took him to the ground because I did not know whether he had a weapon of some sort in the car, or on his person, which he could use to hurt me or my fellow officers."); Presti Dep. Tr. 185:3–7 (Presti testifying that he was thrown to the ground).)[7] The deputies identified themselves as law enforcement to Presti. (Pls.' 56.1 ¶ 72.) During this time, several other deputies, including Sergeant Canteen, Deputy Anselme, and Deputy Jones, arrived on the scene. (*Id.* ¶¶ 73–74; Canteen Decl. ¶ 14; Anselme Dep. Tr. 50:4–18, 54:1216.)

Plaintiff Presti was handcuffed and taken to the New York City Police Department's 122nd Precinct, where he was placed in a holding cell and processed. (Pls.' 56.1 ¶¶ 81–82.) Presti was then transported to the Richmond County Criminal Court, where he was arraigned and then released on his own recognizance. (*Id.* ¶¶ 83–84.)

On the night of his arrest, Presti did not inform anyone that he had been injured, nor did he request medical treatment. (*Id.* ¶¶ 87–88; Presti Dep. Tr. 196:5–11; Matos Decl. ¶ 6.) At his deposition, Presti testified that he never received any medical treatment, including mental health treatment, related to injuries he incurred during his arrest on December 6, 2020. (Pls.' 56.1 ¶¶ 85–86; Presti Dep. Tr. 195:23–196:4.)

On January 25, 2021, the Richmond County District Attorney charged Presti with two counts of violations of the New York State Alcoholic Beverage Control Law. (Pls.' 56.1 ¶ 91.) Presti eventually pleaded guilty to operating an unlicensed bottle club in violation of New York

---

[7] While Plaintiffs argue that there is a factual dispute about the degree of force used to bring Presti to the ground, as discussed *infra* Discussion § I.A, any factual dispute is not material, i.e., sufficient to affect a jury's verdict on Presti's excessive force claim.

State Alcoholic Beverage Control Law § 64-B-1, and was ordered to pay a $1,000 fine.  (*Id.* ¶¶ 97–100.)

## II.    Procedural History

Plaintiffs initiated this action on July 7, 2021.  (*See* Compl., Dkt. 1.)    The operative Amended Complaint, which Plaintiffs filed on December 23, 2021, asserts six causes of action arising out of the City's enforcement of the COVID-19 restrictions against Plaintiffs: (1) a false arrest claim based on the events of December 1, 2020 and December 5–6, 2020, on behalf of both Plaintiffs against all Defendants, under the Fourth and Fourteenth Amendments of the U.S. Constitution through 42 U.S.C. § 1983 (Am. Compl., Dkt. 20 ("Am. Compl."), ¶¶ 74–82); (2) a false imprisonment claim based on the events of December 1, 2020 and December 5–6, 2020, on behalf of both Plaintiffs against all Defendants, under New York law (*id.* ¶¶ 83–88); (3) an excessive force claim based on the events of December 5–6, 2020, on behalf of Plaintiff Presti against all Defendants, under the Fourth and Fourteenth Amendments of the U.S. Constitution through 42 U.S.C. § 1983 (*id.* ¶¶ 89–97); (4) a negligent hiring/training/supervision/retention claim, on behalf of both Plaintiffs against all Defendants (*id.* ¶¶ 98–103); (5) a municipal liability claim on behalf of both Plaintiffs against the City (*id.* ¶¶ 104–112); and (6) a defamation claim on behalf of Plaintiff Presti against Defendant Sheriff Fucito (*id.* ¶¶ 113–19).  Defendants answered the Amended Complaint on January 20, 2022, and the parties proceeded to discovery.  (*See* Dkt. 22.)

On March 10, 2022, while discovery was ongoing, Defendants requested a pre-motion conference ("PMC") to discuss an anticipated motion for summary judgment.  (*See* Dkt. 23.) Subsequently, Defendants withdrew their PMC request at a status conference presided over by the Honorable Judge Sanket. J. Bulsara.  (*See* 4/4/2022 Min. Entry & Order.)  On September 7, 2022,

after the parties completed discovery (*see* 8/24/22 Min. Entry & Order), Defendants filed another PMC request for a summary judgment motion (Dkt. 37), to which Plaintiffs responded on September 14, 2022, (Dkt. 38).  The Court denied the PMC request as unnecessary and set a briefing schedule for Defendants' motion.  (*See* 9/15/2022 Docket Order.)

The motion for summary judgment was fully briefed on March 30, 2023.  (*See* Dkts. 45–47.)  While briefing was ongoing, the parties stipulated to the withdrawal of: (1) Plaintiff Presti's false arrest and imprisonment claim; (2) Plaintiffs' negligent hiring/training/supervision/retention claim against the City; and (3) Plaintiff Presti's defamation claim against Sheriff Fucito.[8]  (*See* Dkt. 40; 11/17/2022 Docket Order.)  Thus, only Plaintiff Gelormino's false arrest and imprisonment claims, Plaintiff Presti's excessive force claim, and the municipal liability claim against the City remain at issue.

## SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must establish that "there is no genuine dispute as to any material fact," and, thus, that the party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."  *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

---

[8] Plaintiffs also stipulated to the withdrawal of all claims against the Sheriff's Office and the Mayor of New York City, both of whom had been named as Defendants in Plaintiffs' Amended Complaint.  (*See* Dkt. 40; 11/17/2022 Docket Order; *see also* Am. Compl.)

"The moving party bears the burden of showing that he or she is entitled to summary judgment." *Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 267 (E.D.N.Y. 2008).  Where the defendant is the moving party, there is "no express or implied requirement" that the defendant "negat[e] the [plaintiff's] claim" with evidence of its own, as long as it "point[s] out to the district court . . . that there is an absence of evidence to support the [plaintiff's] case." *Celotex Corp.*, 477 U.S. at 323, 325 (emphasis omitted).  Once a defendant has met this burden, the plaintiff must "do[] more than simply rely on the contrary allegation[s] in [his] complaint," *Adickes*, 398 U.S. at 160, and "go beyond the pleadings" to "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that a non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment) (collecting cases).

## DISCUSSION

### I.   Presti's Excessive Force Claim

Presti alleges that Defendants used excessive force when they arrested him on December 5–6, 2020.[9]  (*See* Am. Compl. ¶¶ 89–97.)  Defendants argue that they are entitled to summary judgment on Presti's excessive force claim because any force used against Presti was objectively reasonable given the circumstances of the arrest and because qualified immunity shields

---

[9] The Amended Complaint alleges that the incident occurred on December 4–5, 2020, (*see* Am. Compl. ¶¶ 91–92), but the undisputed facts make clear that Presti's arrest actually occurred on December 5–6, 2020, *see supra* Background § I.

Defendants from liability.  (Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Dkt. 56-1 ("Defs.' Mem."), at 7–13.)

### A.       Reasonableness of the Force Used

Claims that law enforcement officers used excessive force during an arrest are analyzed under the Fourth Amendment's "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388, 395–96 (1989); *accord Szabo v. Parascandolo*, No. 16-CV-3683 (PKC) (LB), 2019 WL 481925, at *5 (E.D.N.Y. Feb. 7, 2019) (citing *Kerman v. City of New York*, 261 F.3d 229, 238–39 (2d Cir. 2001)).  "Because 'the Fourth Amendment test of reasonableness is one of objective reasonableness,' the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake."  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)) (cleaned up); *see also Graham*, 490 U.S. at 396 ("Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case[.]" (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979))).  The "key question . . . is 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Chamberlain v. City of White Plains*, 960 F.3d 100, 113 (2d Cir. 2020) (quoting *Graham*, 490 U.S. at 397); *see Brown v. City of New York*, 798 F.3d 94, 100–01 (2d Cir. 2015) ("[T]he officer's state of mind, whether evil or benign, is not relevant.").  Courts consider the totality of the circumstances facing the officer, including, *inter alia*, "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect

11

was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396). The officer's actions must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (quoting *Graham*, 490 U.S. at 396); *MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 7 (2d Cir. 2013) (summary order). In light of the fact-specific nature of the excessive force inquiry, summary judgment against a plaintiff on such a claim is only appropriate where "no reasonable factfinder could conclude that the [officer's] conduct was objectively unreasonable." *Lennox v. Miller*, 968 F.3d 150, 155 (2d Cir. 2020) (citation omitted).

Plaintiffs contend that Defendants used excessive force when they "rammed Presti's car to stop him, then aggressively dragged Presti out of the car, and . . . slammed him to the ground . . . before arresting him[.]" (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., Dkt. 46 ("Pls.' Mem."), at 8–9.) For their part, Defendants do not dispute the fact that they used force, but argue that the degree and type of force used was not unreasonable in light of the circumstances of Presti's arrest. The Court agrees. Although Presti was being arrested for a non-violent offense,[10] *see Graham v. City of New York*, 928 F. Supp. 2d 610, 618–19 (E.D.N.Y. 2013) (explaining that "forcibly removing a non-violent arrestee from his or her car can be the basis of an excessive force claim"), it was objectively reasonable for Defendants to believe that Presti posed an immediate safety threat and had resisted arrest by the time the officers sought to arrest him,[11] *see Garcia v.*

---

[10] Arguably, however, by the time Defendants used *any* force, the crime for which Presti was being arrested had become more serious as he had endangered Sergeant Matos by driving into Matos with his car and then driving recklessly with Matos hanging onto the hood. Moreover, Presti had also seemingly resisted Sergeant Matos's and Deputy Anselme's initial attempt to arrest him. *See, e.g.*, *Tracy*, 623 F.3d at 98; *Taylor v. Ridley*, 904 F. Supp. 2d 222, 233–34 (E.D.N.Y. 2012).

[11] The parties dispute whether Presti knew or should have known that Sergeant Matos and Deputy Anselme were law enforcement officers, and in turn, whether Presti resisted arrest. (*See, e.g.*, Pls.' Mem. at 12 ("Defendants say Presti ran from [the] Sheriff's deputies to his car, but Presti

*Greco*, No. 05-CV-9587 (SCR) (JFK), 2010 WL 446446, at *7 (S.D.N.Y. Feb. 9, 2010)

(explaining that "the balancing inquiry for an excessive force claim may . . . take resistance to an

arrest into account as a highly probative fact" (citation omitted)).  *Cf. Graham*, 928 F. Supp. 2d at

618–19 (denying summary judgment to officers who forcibly removed a non-violent arrestee from

his car where there was no evidence in the record indicating that officers thought the arrestee posed

a threat to safety or had tried to resist or evade arrest).  The undisputed facts show that Presti drove

directly into Sergeant Matos and then proceeded to drive several blocks with Sergeant Matos

clinging to the hood of his car before being forcibly stopped by Sergeant LeBlond's vehicle.[12]

---

said that he ran from people he thought were going to harm him and did not know that they were Sheriff's deputies." (citation omitted)); *see also* Pls.' 56.1 ¶¶ 55–63; Presti Dep. Tr. 152:16–154:10 (Presti testifying that he heard somebody yell out "hey, Presti," and then saw two individuals running towards him), 155:24–156:20 (same), 161:11–24 (Presti testifying that he could not tell if the individuals were wearing uniforms); Matos Decl. ¶¶ 2–3 ("Mr. Presti started running to his car as my partner and I approached him, with both of us yelling 'Police, don't move.  Police, don't move.  Presti, please, don't move!' . . . .  He ignored our repeated commands to stop, quickly entered his car, and put it in gear, while I was standing in front of the vehicle, yelling again very loudly: 'Presti, stop.  Police, don't move.  Presti, get out of the vehicle.  Turn off the vehicle.'"); Anselme Dep. Tr. 29:8–11, 31:5–25 (Anselme testifying that she and Sergeant Matos identified themselves as police when they initially approached Presti).)  This factual dispute is irrelevant to whether Sergeant Matos and Deputy Anselme acted objectively reasonably in arresting Presti.

Even if Presti did not hear Sergeant Matos and Deputy Anselme identify themselves as police or notice that they were in uniform, (*see* Matos Decl. ¶ 4 ("Both Deputy [] Anseleme and I were wearing our Deputy Sheriff uniforms, which have a shield on the jacket with a shield and Sgt. chevrons."); Anselme Dep. Tr. 39:4–40:19 (same)), the Court's focus is "on the sequence of events *from the perspective of a reasonable officer at the scene*."  *Tracy*, 623 F.3d at 97 (emphasis added).  Here, a reasonable officer would have perceived Presti as resisting arrest and being dangerous after he drove directly into Sergeant Matos and then drove several blocks with Sergeant Matos clinging to the hood of the car.  (*See* Matos Decl. ¶ 4 ("There is no possibility that Mr. Presti could not recognize that we were police officers[], at least not from my perspective.")); *see also Tracy*, 623 F.3d at 97 ("[F]rom [the officer's] perspective, Tracy appeared to fail to comply with a direct order and to instead actively resist arrest, thus necessitating a forceful response.").

[12] Plaintiffs' incredulous assertion that "the video shows . . . Plaintiff entering his car to drive away and Sergeant Matos choosing to stand in front of his car and then climb the hood," (Pls.' 56.1 ¶¶ 90, 119), is refuted by the video evidence, which clearly shows Presti driving his car directly into Sergeant Matos, (Security Video 1, Ex. 18 to Balestriere Decl.).  *See Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving

(Security Video 3, Ex. 26 to Balestriere Decl.; Pls.' 56.1 ¶¶ 55–69; Matos Decl. ¶ 3 ("[Presti] quickly entered his car, and put it in gear, while I was standing in front of the vehicle, yelling again very loudly: 'Presti, stop. Police, don't move. . . .' Mr. Presti started driving toward me and I was lifted off the ground and onto the hood as he accelerated, with my face near the windshield . . . . Mr. Presti drove with me clinging to the hood for approximately three blocks . . . before [Sergeant LeBlond] drove . . . into the rear of Mr. Presti's car, forcing him to stop.").)  Sergeant Matos could have been killed or seriously injured; indeed, Sergeant Matos, who was taken to the hospital by ambulance immediately following Presti's arrest, "was out of work for an extended period and needed three months of physical therapy" as a result of his injuries.  (Matos Decl. ¶ 6); *Tracy*, 623 F.3d at 97–98 (noting that defendant officer was injured during his encounter with plaintiff, which lent "further credence to [the court's] conclusion that [the officer's] use of force was both necessary and reasonable under the circumstances").  "The calculus of reasonableness must embody allowance for the fact that [] officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396–97.  Given the volatility of the situation and, in particular, the threat posed to Sergeant Matos, it is beyond cavil that Defendants were entitled to use some amount of force to stop Presti's car and handcuff him.[13]  *See, e.g., Scott*

---

party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court . . . if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007))); *see also Lin v. City of New York*, No. 14-CV-9994 (PAE), 2016 WL 7439362, at *11–12 (S.D.N.Y. Dec. 21, 2016) (granting summary judgment to officers on excessive force claim where video discredited plaintiff's version of events).  To the extent that Sergeant Matos did climb onto the hood of Presti's car, it was clearly only to avoid being run over.  (Security Video 1, Ex. 18 to Balestriere Decl.)

[13] The Court notes that the security videos provided by the parties of the December 6 incident provide little support for Plaintiffs' version of the events and only serves to dramatically validate the officers' perception that Presti was acting in an extremely dangerous and

*v. Harris*, 550 U.S. 372, 386 (2007) (holding that officer's "attempt to terminate the [car] chase by forcing respondent off the road was reasonable" where "[t]he car chase that respondent initiated . . . posed a substantial and immediate risk of serious physical injury to others"); *Tracy*, 623 F.3d at 97–98 (finding that it was reasonable for officer to dive on top of and pin down plaintiff who was resisting arrest); *Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012) (summary order) (affirming dismissal of excessive force claim where plaintiff "resisted arrest by refusing to stand up or to permit himself to be handcuffed," and "patrolmen used only reasonable force to overcome [plaintiff's] resistance"); *Lieberman v. City of Rochester*, No. 07-CV-6316 (DGL), 2011 WL 13110345, at *5 (W.D.N.Y. Apr. 29, 2011) (dismissing excessive force claim against officer who body slammed plaintiff to the ground and then handcuffed him because the force used was not excessive "[c]onsidering the volatility of the situation and the fact that there had recently been a scuffle between the two groups of people present"), *aff'd*, 558 F. App'x 38 (2d Cir. 2014) (summary order); *Richardson v. Providence*, No. 09-CV-4647 (ARR) (LB), 2011 WL 3701887, at *7 (E.D.N.Y. Aug. 22, 2011) (finding that officer was entitled to use some force to arrest plaintiff who had initially struggled while officer was attempting to handcuff him); *Schlaepfer v. City of New York*, No. 20-CV-3339 (KPF), 2022 WL 4484571, at *15 (S.D.N.Y. Sept. 27, 2022) (granting summary judgment to officers who "grabbed [plaintiff] without any verbal commands or warnings, or knowledge that he was being arrested and ran him into [a] wall," where "[p]laintiff's encounter with [the officers] was part and parcel of a rapidly-evolving

---

life-threatening manner toward the deputies. (Security Videos 1–3, Exs. 18, 25–26 to Balestriere Decl.) Moreover, the video marked as Exhibit 26, which shows the deputies pulling Presti from his car and bringing him to the ground in a single swift movement, tends to contradict Presti's claim of being thrown to the ground with excessive or extreme force. (Security Video 3, Ex. 26 to Balestriere Decl.)

situation, involving a late hour, a boisterous nightclub crowd, . . . and an understandable law enforcement concern about physical violence").

That Presti's injuries were *de minimus* is also relevant, albeit not dispositive. *See Gutierrez v. City of New York*, 18-CV-3621 (MKB), 2021 WL 681238, at *14 (E.D.N.Y. Feb. 22, 2021) ("'[T]he extent of injury' is a 'relevant' but non-dispositive factor in evaluating an excessive force claim." (quoting *Abreu v. Nicholls*, 368 F. App'x 191, 193 (2d Cir. 2010) (summary order))); *see also Schlaepfer*, 2022 WL 4484571, at *15 (noting that "[t]he *de minimis* nature of [p]laintiff's injuries confirm that the force used was not excessive," even though "a plaintiff need not have sought medical attention to support an excessive force claim"); *Washpon v. Parr*, 561 F. Supp. 2d 394, 406–07 (S.D.N.Y. 2008) ("(D)e minimis injury can serve as conclusive evidence that de minimis force was used." (citation omitted)).  Presti did not complain of injuries or request medical attention on the night of his arrest, nor did he seek medical treatment for any injuries at any point thereafter.  (Pls.' 56.1 ¶¶ 85–88; *see also* Presti Dep. Tr. 196:5–11 ("Q. Did you ever notify anybody . . . on December 6th that you had been injured while being arrested? A. No. Q. Did you ever ask to receive medical attention after you were arrested on December 6th? A. No."), 195:23–196:4 ("Q. Mr. Presti, did you ever receive any medical treatment as a result of your arrest on December 5th and 6th? A. No. Q. Did you ever receive any mental health treatment as a result? A. No."); Matos Decl. ¶ 6 ("[Presti] did not complain of any injuries nor request medical attention, either at the scene [of the arrest] or at the precinct.").)  Notably, the Amended Complaint did not identify any specific physical injury that Presti suffered on December 6, (*see* Am. Compl. ¶¶ 95, 97 (alleging only "Presti has suffered damages in the form of physical suffering[,] mental suffering and humiliation, loss of time and interruption of business, and injury to reputation")), and at his deposition, Presti testified to sustaining only a "[b]ruised shoulder and a bruised chin,"  (Presti

Dep. Tr. 185:2–3).  (*See also* Presti Dep. Tr. 189:5–22 ("Q. You indicated that you had an injury to your chin. A. I did. Q. What was that injury? A. Just a bruise? Q. Was there any blood? A. A little bit. Q. So your skin was scraped? A. Yes. Q. And your shoulder, you said you bruised your shoulder? A. Yes. Q. Anything else? A. No. Q. Was there any other injury to your shoulder? A. No. Q. Did it break the skin? A. No.").)  The *de minimus* nature of Presti's injuries further supports the conclusion that the amount of force used "was a reasonable and proportionate response under the circumstance," *Tracy*, 623 F.3d at 97, and that Presti could not prove his excessive force claim at trial.  *See, e.g.*, *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 376–77 (S.D.N.Y. 2015) (collecting cases in which courts have "dismissed excessive force claims where the plaintiff alleged that he was thrown to the ground, but did not allege any physical injuries"); *Schlaepfer*, 2022 WL 4484571, at *15 (granting summary judgment to defendant officers where plaintiff testified that he suffered head pain, a cut on his forehead, and a bruise, but had "refused medical assistance because he did not think the injury was that serious" (internal quotation marks omitted)); *Kayo v. Mertz*, 531 F. Supp. 3d 774, 798 (S.D.N.Y. 2021) (explaining that "[d]e minimis injuries can serve as evidence that *de minimis* force was used," and finding that plaintiff's injuries, which included scrapes on his knees and elbow and pain in his ribs and neck, were "simply too *de minimis* to . . . raise an inference that an unconstitutional amount of force was used in effecting his arrest," where plaintiff testified that he did not seek any medical treatment or even treat the injuries himself).

Accordingly, the Court finds that, under the totality of the circumstances and viewing the evidence in the light most favorable to Plaintiffs, Defendants are entitled to summary judgment on Presti's excessive force claim.

### B.    Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) ("The doctrine of '[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))).  When an officer invokes qualified immunity in support of a motion for summary judgment, the court considers two questions: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  *Tracy*, 623 F.3d at 96.  "In the context of excessive force claims, qualified immunity applies if 'a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.'"  *Schlaepfer*, 2022 WL 4484571, at *16; *Richardson*, 2011 WL 3701887, at *7 ("Police officers are entitled to qualified immunity for their actions unless it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.").  "[E]ven officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'"  *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

Assuming, *arguendo*, that Defendants' use of force was excessive, the Court finds that Defendants would nonetheless be entitled to summary judgment on qualified immunity grounds. Given Presti's conduct and the threat he posed to Sergeant Matos, it would not be clear to a

18

reasonable officer that the amount of force used to stop Presti's car and handcuff him was unlawful. *See Hodge v. City of Long Beach*, 425 F. App'x 33, 35 (2d Cir. 2011) (summary order) (quoting *Saucier*, 533 U.S. at 202); *e.g.*, *Garcia*, 2010 WL 446446, at *8 (finding that because it was objectively reasonable for defendant officer to use force to prevent plaintiff from fleeing and assaulting an officer, it was also objectively reasonable for officer to believe he was not infringing on plaintiff's Fourth Amendment rights in using force to effect plaintiff's arrest).   Moreover, Plaintiffs have failed to point to existing precedent that "'squarely governs' the specific facts at issue" in this case.  *See Kisela*, 584 U.S. at 104–05 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)); *e.g.*, *Young v. Cabrera*, No. 18-CV-3028 (RPK) (ST), 2020 WL 7042759, at *5 (E.D.N.Y. Nov. 30, 2020) (granting summary judgment on qualified immunity grounds where the parties pointed to no precedent that would have informed the defendant officers "that they could not tackle an arrestee to the ground" where it appeared that the arrestee posed a risk to officer safety).  Accordingly, Defendants are entitled to qualified immunity on Presti's excessive force claim.

## II.    Gelormino's False Arrest/Imprisonment Claim

Gelormino brings a claim for false arrest and imprisonment[14] arising out of his detention on December 1, 2020.  (Am Compl. ¶¶ 83–88.)  Defendants argue that they are entitled to summary judgment on Gelormino's false imprisonment claim because, *inter alia*, there was probable cause to arrest Gelormino, and because qualified immunity shields Defendants from liability.  (Defs.' Mem. at 13–19.)

A "§ 1983 claim for false arrest derives from [a plaintiff's] Fourth Amendment right to remain free from unreasonable seizures." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).  To

---

[14] For ease of reference, the Court refers to this claim as Gelormino's false arrest claim.

prevail on a claim of false arrest or unlawful imprisonment, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F. 3d 63, 75 (2d Cir. 2003) (quotation omitted). "[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly*, 439 F.3d at 152. "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citation omitted). Whether probable cause exists is analyzed from an objective perspective and depends on the facts known to the arresting officer and/or other law enforcement officials involved with the investigation at the time of the arrest; the arresting officer's state of mind is irrelevant. *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).

Defendants contend that there was probable cause to arrest Gelormino on December 1, 2020, for violating a New York City Department of Health and Mental Hygiene Order. (Defs.' Mem. at 13.) In support of their argument, Defendants note that there is a "plethora of available video footage of [Gelormino] exhorting the protestors outside the bar—both while Mac's Pub was shuttered and not in operation on December 2, as well as while it was operating illegally on December 4—and also from inside the bar during a televised December 4 interview of Gelormino and Presti while Mac's Pub was operating notoriously and in open defiance of the New York State and City closure orders." (Defs.' Mem. at 14.) The Court rejects Defendants' patently erroneous attempt to explain why there was probable cause to arrest Gelormino on December 1, 2020, based on events that occurred *after* that date. *See Finigan v. Marshall*, 574 F.3d 57, 61–62 (2d Cir. 2009)

("In determining whether there was probable cause, our inquiry is an objective one that focuses on the facts available to the arresting officer *at the time of the arrest*." (emphasis added)).  Nor is the Court convinced by Defendants' argument that there was probable cause to arrest Gelormino because he "remained on the premises after deputies instructed all non-employees to leave." (Defs.' Mem. at 14), given that it is undisputed that Gelormino asked and received permission from the deputies to stay, (Defs.' Reply 56.1 ¶¶ 19–20).

Nevertheless, the Court concludes that Defendants are entitled to summary judgment on Gelormino's false arrest claim based on qualified immunity.  A law enforcement officer is entitled to qualified immunity on a false arrest claim "if 'arguable probable cause' existed—that is, if 'a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well[-]established law.'"  *Antic v. City of New York*, 273 F. Supp. 3d 445, 452 (S.D.N.Y. 2017) (quoting *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001)), *recons. den.*, No. 16-CV-2425 (JMF), 2017 WL 3491967 (S.D.N.Y. Aug. 14, 2017), *aff'd*, 740 F. App'x 203 (2d Cir. 2018) (summary order).  "Specifically, the doctrine of qualified immunity provides a complete defense where 'either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  *Id.* at 452 (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

The Court concludes that, at a minimum, the deputies had arguable probable cause to arrest Gelormino.[15]  As Sergeant LeBlond testified at his deposition:

> Mr. Gelormino was present inside of Mac's Pub while the governor's executive
> order was in effect, while [Mac's] liquor license has been suspended, while there

---

[15] It is also unclear whether Plaintiffs would be able to prove that Gelormino was confined without his consent.  As noted, Gelormino initially asked permission to stay at Mac's after the deputies instructed everyone other than employees to leave.  (Defs.' Reply 56.1 ¶¶ 19–20; LeBlond

had been a New York City and a New York State Department of Health closure order, [and] he identified himself as Counsel for Mac's Pub and/or Danny Presti. When we went in there, we had undercover officers in there, the business—there was criminal activity afoot and Mr. Gelormino was present during this criminal activity.

(LeBlond Dep. Tr. 142:2–142:14.)  Under New York law, "'[a]n assessment of probable cause

becomes easier in the scenario of a direct observation of a legal infraction,' because N.Y. Crim.

Proc. Law § 140.10(1)(a) provides, in pertinent part, that 'a police officer may arrest a person for

[a]ny offense when he or she has reasonable cause to believe that such person has committed such

offense in his or her presence.'" *Adamides v. Warren*, No. 21-CV-6613 (CJS), 2022 WL 2788435,

at *11 (W.D.N.Y. July 15, 2022) (alterations in original) (quoting *Clay v. Riordan*, No. 18-CV-

933 (LJV), 2020 WL 3893809, at *4 (W.D.N.Y. July 10, 2020)), *R. & R. adopted*, 2020 WL

4474160 (W.D.N.Y. Aug. 4, 2020)); *see also Kee v. City of New York*, 12 F.4th 150, 159 (2d Cir.

2021) ("[A] police officer may arrest a person *for a crime* when the officer has 'reasonable cause

to believe that such person has committed such crime, *whether in [the officer's] presence or*

*otherwise*,' but [] an officer may arrest a person *for a violation* only when the officer has

---

Dep. Tr. 142:20–25; Gelormino Dep. Tr. 88:19–89:11.)  Based on the current record, the Court is unable to determine whether Gelormino subsequently asked to leave.  On the one hand, it appears to be undisputed that "the Sheriff's deputies did not permit [P]laintiff Gelormino to leave the premises" after he started filming.  (Pls.' 56.1 ¶ 26.)  Rather than cite to evidence that explains the circumstances of this assertion, however, the parties cite to the paragraph in the Amended Complaint alleging that Gelormino "asked to leave the premises at least twice and both times [] Defendants blocked his way and said he was not allowed to leave," (Am. Compl. ¶ 35), and the corresponding paragraph in Defendants' Answer to the Amended Complaint "admit[ting] that after Gelormino refused to followed [sic] Sheriff's Deputy's directions, he was not free to leave the premises," (Answer to Am. Compl., Dkt. 22, ¶ 35).  On the other hand, in their reply brief, Defendants argue that "there is no competent evidence" to support Gelormino's "conclusory allegation that he asked to leave."  (Defs.' Reply at 4; *see also* LeBlond Dep. Tr. 143:11–14 (testifying that he did not recall if Gelormino asked to leave).)  Ultimately, any factual dispute as to whether Gelormino was prevented from leaving at any point during the December 1 encounter, is ultimately immaterial, given that the Court finds Defendants are entitled to qualified immunity with respect to any arrest of Gerlormino.

'reasonable cause to believe that such person has committed such offense *in his or her presence*[.]'" (quoting N.Y. Crim. Proc. Law § 140.10(1))).

Here, the deputies observed Gelormino at Mac's while it was operating in violation of the City's Department of Health and Mental Hygiene Closure Order, as well as numerous other COVID-19 emergency orders.  (*See* Dkt. 45-8 (closure order); LeBlond Dep. Tr. 141:20–143:7 ("When we went in there, we had undercover officers in there, the business—there was criminal activity afoot and Mr. Gelormino was present during this criminal activity.").)  These violations constituted misdemeanors.  (*See* Dkt. 45-8 at 4 (violation of the City's Department of Health and Mental Hygiene Closure Order constitutes a misdemeanor); N.Y. Exec. Law § 24(5) ("Any person who knowingly violates any local emergency order of a chief executive promulgated pursuant to this section is guilty of a class B misdemeanor."); N.Y.C. Admin. Law § 3-108 ("Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."); N.Y.C. Charter § 562 ("Except in cases where it is otherwise provided by law, every violation, neglect or refusal by any person to comply with any order of the commissioner or the board of health shall be triable by a judge of the New York city criminal court and shall be treated and punished as a misdemeanor."); *see also Sorokti v. City of Rochester*, No. 21-CV-6709 (FPG), 2022 WL 2356757, at *6–7 (W.D.N.Y. June 30, 2022) (dismissing false arrest claim because there was probable cause to arrest plaintiff for violating an emergency order that prohibited gatherings of five or more people in a public place between 11:00 p.m. and 5:00 a.m. where plaintiff was arrested while protesting in a large crowd at 12:45 a.m.).  Moreover, because Gelormino identified himself as Presti's attorney when asking to remain in the bar, the deputies had an arguable basis to believe that Gelormino knew that Mac's

was operating illegally at the time.  (*See* LeBlond Dep. Tr. 141:20–143:7.)  Accordingly, the Court finds that there was at least arguable probable cause to detain Gelormino for the purposes of issuing him summonses, and thus Defendants are entitled to summary judgment on Gelormino's false arrest claim based on qualified immunity grounds.[16]

### III.   Municipal Liability

Plaintiffs seek to impose liability on the City of New York for the purported constitutional violations discussed above.  (*See* Am. Compl. ¶¶ 104–12.)  Defendants move for summary judgment with respect to Plaintiffs' *Monell* claim, arguing that there is no evidence that a municipal custom or policy caused the alleged constitutional violations.  (Defs.' Mem. at 19–20.)

A municipality, like the City, may be liable under Section 1983 if a municipal "policy or custom" caused a deprivation of constitutional rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978); *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." (alteration in original)).  "Because liability cannot be based simply on a theory of *respondeat superior*, 'a local government may not be sued under [Section] 1983 for an injury inflicted solely by its employees or agent.'"  *Nixon v. City of New York*, No. 19-CV-7215 (PKC) (LB), 2021 WL 4033627, at *5 (E.D.N.Y. Sept. 3, 2021) (quoting *Monell*, 436 U.S. at 691, 694); *see also Daniel v. Orlando*, No. 16-CV-1418 (PKC) (RML), 2019 WL 1791517, at *8 (E.D.N.Y. Apr. 24, 2019)

---

[16] Defendants also argue that based on the undisputed facts, Gelormino was subjected to a limited and permissible *Terry* stop that never ripened into an arrest.  (Defs.' Mem. at 16.)  This argument, however, arguably raises disputed factual questions about the nature of Gelormino's detention, if any.  Because the Court finds that Defendants are entitled to qualified immunity based on a finding of arguable probable cause, the Court need not, and does not, address Defendants' *Terry* stop argument.

("[M]unicipalities are responsible only for their own illegal acts, and cannot be held vicariously liable under [Section] 1983 for their employees' actions." (quoting *Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (summary order)).  Rather, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Johnson v. N.Y.C. Police Dep't*, 651 F. App'x 58, 60 (2d Cir. 2016) (summary order) (quotation omitted); *accord Fleurimond v. Holder*, 403 F. Supp. 3d 95, 114 (E.D.N.Y. 2019).  In sum, "[a] municipality may be liable under [Section] 1983 only if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Cash*, 654 F.3d at 333 (cleaned up); *see also Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 220 (E.D.N.Y. 2015) ("Under Section 1983, a municipality can be found liable only where the municipality itself causes the constitutional violation at issue."), *aff'd sub nom. Bartels v. Schwarz*, 643 F. App'x 54 (2d Cir. 2016) (summary order).

To establish the first element, the existence of an official policy or custom, a plaintiff must show at least one of the following: "(1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train, discipline, or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff." *Aguirre v. City of New York*, No. 15-CV-6043 (PKC), 2017 WL 4236552, at *4 (E.D.N.Y. Sept. 22, 2017) (cleaned up); *see also Fleurimond*, 403 F. Supp. 3d at 114 ("To demonstrate an official policy or custom, a plaintiff must show 'the existence of a formal policy which is officially endorsed by the municipality,' or a practice that is 'so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or

that a municipal custom, policy, or usage can be inferred from the evidence of deliberate indifference of supervisory officials as to such abuses.'" (quoting *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order))).   The second element requires a plaintiff to establish a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Cash*, 654 F.3d at 333 ("Plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." (cleaned up)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("The mere invocation of the pattern or plan will not suffice without [a] causal link." (cleaned up)).  Finally, the plaintiff must prove that their constitutional rights were in fact violated. *See, e.g.*, *Leon v. City of New York*, No. 09-CV-8609 (WHP), 2010 WL 2927440, at *5 (S.D.N.Y. July 1, 2010) ("A municipality cannot be liable for acts by its employees which are not constitutional violations.").

Defendants are entitled to summary judgment on Plaintiffs' *Monell* claim because Plaintiffs cannot establish that they suffered constitutional violations that were caused by a municipal policy or custom.  *See Sankar v. City of New York*, 867 F. Supp. 2d 297, 308 (E.D.N.Y. 2012) ("[M]unicipal liability cannot be predicated only upon the isolated unconstitutional acts of individual officers").  While Plaintiffs' precise theory of liability is difficult to decipher, they appear to argue in their opposition to Defendants' motion that the City failed to properly train, discipline, or supervise the individual Defendants—that is, Sheriff Fucito, Sergeant Matos, Sergeant LeBlond, Sergeant Canteen, Deputy Anselme, and Deputy Jones—with respect to the use of force in the context of enforcing the COVID-19 public health restrictions, which amounted to "deliberate indifference" to Plaintiffs' constitutional rights. (*See* Pls.' Mem. at 16 (arguing that "knowing and deliberate indifference was demonstrated by the [City's] failure to exercise

reasonable care to supervise the Sheriffs in the proper use of force"); *id.* at 16–17 ("Mayor de Blasio failed to maintain a procedure for investigating complaints of excessive force, even though he was aware or should have been aware that the Sheriffs were likely to use unnecessary force given that they were untrained, unskilled, and inexperienced with enforcing public health restrictions, particularly in a highly charged public health emergency.").)

Defendants are also entitled to summary judgment because Plaintiffs have failed to present sufficient evidence to allow a reasonable trier of fact to find that either Presti or Gelormino suffered a constitutional violation. "Under Second Circuit case law, 'a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor.'" *Daniels v. City of New York*, No. 16-CV-190 (PKC) (JO), 2018 WL 4119191, at *12 (E.D.N.Y. Aug. 29, 2018) (quoting *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010)); *Dorsey v. Gannon*, No. 22-2735, 2024 WL 1338772, at *3 (2d Cir. Mar. 29, 2024) (summary order) ("[T]here can be no *Monell* liability where there has not been an underlying constitutional violation." (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006))). Thus, "[w]here there is no underlying constitutional violation, there is no basis for a claim of municipal liability." *Walston v. City of New York*, 289 F. Supp. 3d 398, 415–16 (E.D.N.Y. 2018), *aff'd*, 754 F. App'x 65 (2d Cir. 2019); *see also Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy[.]"). Because the Court has granted summary judgment to Defendants on Plaintiff's excessive force and false arrest claims, it must grant summary judgment to Defendants on Plaintiffs' *Monell* claim as well. *See Daniel*, 2019 WL 1791517, at *8; *see also, e.g.*, *Daniels*, 2018 WL 4119191, at *12; *Rochester v. Cnty. of Nassau*, No. 10-CV-6017 (PKC) (SLT), 2019 WL 955032, at *6 (E.D.N.Y. Feb. 27, 2019);

*Walston*, 289 F. Supp 3d at 415–16 ("As [p]laintiffs' claims of a false arrest and malicious prosecution against the [individual defendants] must fail as a matter of law, so too must their claim for municipal liability against the [c]ity.").  This alone warrants a grant of summary judgment on Plaintiff's *Monell* in Defendants' favor.  *See Johnson*, 651 F. App'x at 60 (finding that to establish *Monell* claim, plaintiff must prove, *inter alia,* that plaintiff was "subjected to . . . a denial of a constitutional right" (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007))).

Nonetheless, the Court also discusses the absence of any evidence that the City's alleged failure to train, supervise, or discipline Defendants with respect to enforcing the City's COVID-19 restrictions amounted to "deliberate indifference" to Plaintiffs' constitutional rights.  Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [their] action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Newkirk v. Cnty. of Suffolk*, No. 17-CV-2960 (MKB), 2022 WL 824137, at *8 (E.D.N.Y. Mar. 18, 2022) (explaining that the plaintiff must show "that 'the need for more or better supervision to protect against constitutional violations was obvious'" (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018))); *Fleurimond*, 403 F. Supp. 3d at 115 ("[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992))); *see also Fowler v. City of New York*, No. 13-CV-2372 (KAM) (ST), 2019 WL 1368994, at *12 (E.D.N.Y. Mar. 26, 2019) (noting that "[t]he Supreme Court has cautioned that municipal liability under *Monell* is 'at its most tenuous' under a failure to train theory" (quoting *Connick*, 563 U.S. at 61)), *aff'd*, 807 F. App'x 137 (2d Cir. 2020) (summary order).  "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than

mere negligence." *Newkirk*, 2022 WL 824137, at *8 (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004)).

Here, Plaintiffs fall far short of meeting the "stringent" deliberate indifference standard. *See Connick*, 563 U.S. at 61.  To the contrary, Plaintiffs' municipal liability claim rests entirely on a series of conclusory assertions: (1) "[h]ere, . . . the knowing and deliberate indifference was demonstrated by the [City]'s failure to exercise reasonable care to supervise the Sheriffs in the proper use of force"; (2) "Plaintiffs were only harmed because of the way Mayor Bill de Blasio and Sheriff Fucito chose to use the New York City Sheriff's office—an agency of the New York City Department of Finance—to fulfill duties normally reserved for the New York Police Department"; and (3) "Mayor de Blasio failed to maintain a procedure for investigating complaints of excessive force, even though he was aware of or should have been aware that the Sheriffs were likely to use unnecessary force given that they were untrained, unskilled, and inexperienced with enforcing public health restrictions, particularly in a highly charged public health emergency." (Pls.' Mem. at 16–17.)  Such conclusory statements are not enough to defeat Defendants' motion for summary judgment, especially where Plaintiffs are unable to establish that Defendants committed any constitutional violation with respect to the use of force or arrest as to them.[17]  *See*

---

[17] Other than deposition testimony indicating that Sheriff Fucito spoke with Mayor de Blasio about the City's COVID-19 policies and the closure order for Mac's Bar, Plaintiffs primarily rely on a handful of newspaper articles reporting on New York's response to the COVID-19 pandemic to support their *Monell* claim. (*See* Pls.' 56.1 ¶¶ 124, 126 (citing Associated Press, *New York City bar owner, who has defied coronavirus restrictions, hit deputy with car*, CBS News, Dec. 7, 2020, Dkt. 46-11; Jesse McKinley, et al., *How a Feud Between Cuomo and de Blasio Led to a Chaotic Virus Crackdown*, N.Y. Times, Oct. 12, 2020, Dkt. 46-12; Michael Gold, *Bill de Blasio Knows New York Is Tired of Him. He's at Peace With It.*, N.Y. Times, Sept. 9, 2022, Dkt. 46-13).)  As an initial matter, "[n]ewspaper articles are generally inadmissible hearsay," and because Plaintiffs offer no basis for their admissibility, such articles cannot be used to defeat summary judgment. *Carmichael v. City of New York*, 34 F. Supp. 3d 252, 259 n.5 (E.D.N.Y. 2014) (citations omitted); *see also, e.g.*, *Outerbridge v. City of New York*, No. 13-CV-5459 (AT) (DCF), 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) ("The newspaper articles submitted by

*Ostensen v. Suffolk Cnty.*, 236 F. App'x 651, 652 (2d Cir. 2007) (summary order) ("[I]n opposing

a motion for summary judgment, the non-moving party may not rely on conclusory allegations or

unsubstantiated speculation." (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))); *e.g.*,

*Sullivan v. City of New York*, 690 F. App'x 63, 67 (2d Cir. 2017) (summary order) (affirming

dismissal of *Monell* claim on summary judgment where plaintiff provided "insufficient evidence

that any alleged violation resulted from a policy or custom"); *Ceparano v. Cnty. of Suffolk*, No.

10-CV-2030 (SJF) (AKT), 2013 WL 6576817, at *7 (E.D.N.Y. Dec. 13, 2013) ("[C]onclusory

allegations of municipal liability will not defeat a motion for summary judgment on a *Monell*

claim." (quoting *Sheik v. City of N.Y. Police Dep't*, No. 03-CV-6326, 2008 WL 5146645, at *11

(E.D.N.Y. Dec. 5, 2008))).   Plaintiffs provide no evidence that the City disregarded a known or

obvious risk, such as evidence of any prior or ongoing misconduct by the Sherriff's Office in

enforcing the City's COVID-19 restrictions.[18]   *See Vann v. City of New York*, 72 F.3d 1040, 1049

(2d Cir. 1995) ("An obvious need [for more or better supervision] may be demonstrated through

proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if

---

Plaintiff [] cannot serve as evidence of the City's municipal policy or custom.") (collecting cases).
Even so, the contents of the newspaper articles lend little support for Plaintiffs' assertions and
claims, let alone create a dispute of material fact regarding whether a municipal policy or custom
caused the constitutional deprivations that forms the basis of Plaintiffs' *Monell* claims.

[18] The Court is not convinced by Plaintiffs' contention that "[t]he City had sufficient notice
of the constitutionality [sic] of its practices" after Gelormino's arrest.  (Pls.' Mem. at 3–4.)  The
alleged violation stemming from Gelormino's arrest—false imprisonment—for violating a closure
order at Mac's is not factually similar enough to the alleged violation stemming from Presti's
arrest—excessive force—after Presti almost ran over and then seriously injured Sergeant Matos a
few days later, to warrant such an inference.  *Demosthene v. City of New York*, No. 18-CV-1358
(ARR) (PK), 2019 WL 181305, at *10 (E.D.N.Y. Jan. 10, 2019) ("[P]laintiff's citation to
complaints 'premised on a different set of factual allegations,' where the underlying incidents
arose during factually divergent contexts, 'does not support an inference that [his] injuries were
caused by the City's failure to train its employees.'" (quoting *Simms v. City of New York*, 480 F.
App'x 627, 630 (2d Cir. 2012) (summary order))).

the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."); *Fowler*, 2019 WL 1368994, at *13 (granting summary judgment for the City on *Monell* claim where plaintiff "failed to demonstrate an underlying pattern of constitutional violations that would [have] put the City on actual or constructive notice of the obvious risk of harm to its citizens without meaningful efforts by the City"). Nor do Plaintiffs suggest that any policymaker witnessed "a single, isolated act of brutality" so extreme that would permit a factfinder to infer deliberate indifference through a conscious decision not to act. *Amnesty Am.*, 361F. 3d at 127–29 (inferring deliberate indifference through evidence showing that policymaker attended, witnessed, ignored, and even encouraged instances of excessive force at successive protests). Finally, Plaintiffs offer no evidence demonstrating "a direct causal link" between a municipal policy or custom and the alleged constitutional violation, i.e., the alleged excessive force. *Hernandez v. United States*, 939 F.3d 191, 207 (2d Cir. 2019) (quotation omitted). Plaintiffs' municipal liability claim therefore must be dismissed on this ground as well. *See, e.g.*, *Arroyo v. City of New York*, 683 F. App'x 73, 75 (2d Cir. 2017) (summary order) (affirming summary judgment when the plaintiff "offered no evidence of a citywide policy or custom," let alone "linked such a policy to her treatment"); *Castro v. Cnty. of Nassau*, 739 F. Supp. 2d 153, 172 (E.D.N.Y. 2010) (granting summary judgment when the plaintiff "produced no evidence of a municipal policy or custom," but "simply assert[ed], without citing to any evidence, that the facts suggest[ed] a custom, pattern or practice of officers failing to adequately investigate an allegation before making an arrest, thereby causing violations of an individual's civil rights" (cleaned up)).

Accordingly, the Court grants summary judgment to the City on Plaintiffs' municipal liability claim.

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is granted as to all of the remaining claims in this case.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: July 10, 2024
      Brooklyn, New York